UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL ACTION |
| VERSUS | * | NO. 04-094 |
| DONALD SYLVESTER | * | SECTION "F" |

ORDER AND REASONS

Before the Court is the defendant's post-trial motion for discovery based on newly discovered evidence.  For the reasons that follow, the motion is DENIED.

Background

On September 10, 2007 a jury convicted Donald Sylvester of the contract murder of a federal grand jury witness, Demetra Norse, and of related firearms offenses and drug violations.  Sylvester was acquitted of a separate charge of conspiracy to murder Tyrone McCaskill.

On April 4, 2003 Demetra Norse testified before a federal grand jury about a cocaine and crack distribution conspiracy.  Two months later, on June 4, 2003, Demetra Norse was murdered in broad daylight at the corner of Almonaster Street and Law Street in New Orleans.  She was shot several times while walking with a friend. An investigation followed.

Rahsaan Johnson, who was being held awaiting rearraignment on

1

other charges, told law enforcement officials that Terrence Lash had admitted his involvement in the Norse murder. He agreed to wear a wire to record his conversations with Lash.

On February 17, 2004 Johnson and Lash were being held in custody together awaiting arraignment on a superseding indictment. While Johnson was wired, Lash admitted to Johnson that he had hired Donald Sylvester to murder Ms. Norse because she was going to be a witness in a federal trial.

On March 4, 2004 the Government obtained an arrest warrant for Sylvester in connection with Norse's murder. Four days later, Sylvester, accompanied by his then-attorney, Robert Jenkins, surrendered to Assistant United States Attorney Maurice Landrieu at the Hale Boggs Federal Building in New Orleans. DEA Agent Chad Scott was also present at the March 8, 2004 meeting. Landrieu played a segment of the February 17, 2004 tape recording, in which Lash identified Sylvester as Norse's murderer. Landrieu then told Sylvester and his attorney that, although it was the Attorney General's final decision, he would recommend that the Government not seek the death penalty if Sylvester agreed to plead guilty to the murder. After consulting with his attorney, Sylvester fully confessed to killing Norse. However, several days later, Sylvester decided he would rather go to trial; he fired Robert Jenkins and the Court appointed new counsel to represent him.

A single-count indictment was filed on April 1, 2004, charging

2

Sylvester with the contract murder of Demetra Norse.  Then on July 9, 2004 Sylvester moved to suppress his confession of March 8, 2004, claiming it had been obtained in violation of Federal Rule of Evidence 410.  He submitted that his March 8 statements were made during the course of plea negotiations with the Government.  After an extensive evidentiary hearing and the submission of post-hearing memoranda, in November 2004, this Court denied the defendant's motion, finding that Sylvester made a knowing and voluntary waiver of his rights under Rule 410.[1]  (Meanwhile, the U.S. Attorney's Office sought permission to seek the death penalty; on December 20, 2005, the Attorney General denied the request for permission to seek the death penalty.)

On September 14, 2006 the Government filed an 11-count Superseding Indictment.  In addition to the charges relating to the murder of Demetra Norse, the Government charged Sylvester with drug conspiracy, still another murder conspiracy (relating to a conspiracy to murder Tyrone McCaskill), drug possession, conspiracy to possess weapons in furtherance of a drug crime, and being a felon in possession of a firearm.

The jury trial began on August 27, 2007; on September 10, 2007 the jury convicted Sylvester of the contract murder of Norse,

---

[1] The Court also previously found that AUSA Landrieu's testimony of what he said to Sylvester during his meeting in March 2004 was credible and was supported and confirmed by his subsequent email to DOJ about his encounter with Sylvester.  Nothing in the pending submissions has shaken that determination.

related firearms offenses and drug violations.[2]  Sylvester was acquitted of conspiracy to murder Tyrone McCaskill.

Sylvester now seeks post-trial discovery of the Attorney General's allegedly written reasons for the rejection of the U.S. Attorney's recommendation for the death penalty.[3]  His counsel now gambles that Sylvester avoided the death penalty authorization because the Department of Justice must have found that the Government used the threat of the death penalty to coerce his March 8, 2004 confession to the murder-for-hire of Demetra Norse.  The

---

[2] At trial, the circumstances of Sylvester's confession were again fully and aggressively scrutinized, including the testimony of his then-attorney, Mr. Jenkins, and Sylvester himself.  The jury rejected Mr. Sylvester's account of what occurred, as did this Court at the suppression hearing.

[3] Counsel for defendant asserts that he first learned shortly after December 17, 2007 that a written memorandum of reasons for rejecting the death penalty authorization possibly exists.  The amendments to the protocol became effective on July 1, 2007, following a Congressional hearing regarding oversight of the federal death penalty in June 2007.  But defense counsel says he was not tipped off until months later, specifically after December 17, 2007, to this change to the protocol (that states that the Committee's reasons for disagreeing with the U.S. Attorney's recommendation are memorialized) until the DOJ forwarded to Senator Feingold on December 17, 2007 its written responses to specific questions posed to an Assistant Attorney General.  This Q and A specifically addresses questions about the revised departmental protocol, noting that: (1) the DOJ decided to include the express prohibition against using the death penalty for negotiating purposes, (2) the DOJ death penalty review is an open process, that the Attorney General's Reasons for overruling a capital recommendation are conveyed to the U.S. Attorney, and that there is ongoing discussion and dialogue among the parties involved, and, also, (3) the United States Attorney receives a copy of the Capital Crimes Committee's Memorandum articulating the rationale for the Committee's recommendation to the Attorney General.

defendant argues, if indeed the DOJ rejected authorization for the death penalty because it concluded that Landrieu had improperly used the death penalty as bargaining leverage and, further, if those written reasons were conveyed to Landrieu, then that would contradict Landrieu's trial testimony on cross-examination (that no rationale was given to his office as to why the Attorney General rejected the recommendation to seek the death penalty in his case).

Because the Government acknowledged that it had in its possession a previously-undisclosed excerpt from the Committee memo outlining its reasons for disagreement with the U.S. Attorney's death recommendation,[4] the defendant has now broadened his original request for discovery, asserting that he is entitled to discover any governmental memoranda conveying the DOJ's[5] (not just the

---

[4] The Government originally maintained that what Sylvester was searching for -- a Memo from the Attorney General suggesting that it rejects the death penalty recommendation because the U.S. Attorney violated death penalty protocol by using the threat of the most severe penalty during the course of plea negotiations -- simply does not exist. Instead, the Government insisted that *the Attorney General's* decision was communicated in a one-sentence letter to the United States Attorney and gave no reasons whatsoever for the decision.

[5] At oral argument, defense counsel stated:

> I want to make it crystal clear: at no point was I drawing technical distinctions between the Attorney General and the Committee. We were talking about what flowed from the Department of Justice to the mind of the U.S. Attorney.... We were talking about knowledge of why the case had been turned down.

Attorney General's) reasons for rejecting the U.S. Attorney's recommendation to seek the death penalty.[6]  The defendant insists that any such document could undermine Mr. Landrieu's credibility, which counsel insists was "very much in issue" at the pre-trial suppression hearing as well as at trial.  Further, counsel contends that the content of the Committee Memorandum, if it says what he speculates it says, is independently admissible under Rule 803(8)(C) not only as an attack on Landrieu's credibility, but in support of the defendant's claim that his confession was tainted by the manner in which it was obtained, in violation of USAM 9-10.110.[7]  Therefore, Sylvester urges, he is entitled to fully evaluate the evidentiary significance of the Committee's memorandum or, alternatively, it should be submitted to the Court for *in camera* inspection (which in fact has occurred).

After hearing oral argument on April 30, 2008, the Court

---

[6] The Government now concedes that it has a copy of an excerpt from a Memo authored by the Capital Crimes Committee -- not any written reasons from the Attorney General himself as to why he made the ultimate decision to reject authorization -- but disputes whether that would be responsive to the defendant's discovery request (which the Government insists was a request for the AG's reasons not the Capital Crimes Committee).  It also insists that the Memo is privileged, and, finally, contends that, even if the Memo was disclosed, the defendant could not meet the new trial standard.  The Memo has been submitted under seal for the Court's *in camera* review.

[7] Section 9-10.110 of the U.S. Attorney's Manual provides in part that "[t]he death penalty may not be sought, and no attorney for the Government may threaten to seek it, solely for the purpose of obtaining a more desirable negotiating position."

6

ordered supplemental briefing.  The parties have submitted their papers and the Government has also submitted under seal for the Court's *in camera* review a segment of the Capital Crimes Committee Memorandum conveying some comments in light of the U.S. Attorney's recommendation.  The Court first considers whether the defendant is entitled to discover the Committee's excerpt.[8]  He is not.

I.

Death is the ultimate criminal penalty in our federal justice system.  A witnessing of the internal administrative and discretionary decision-making process and policies informing the institutional discretion to seek the death penalty, or to choose not to, is at the heart of the defendant's submission.

The Federal Death Penalty Act of 1994 created general procedures for imposing a death sentence and designated over forty crimes as death penalty-eligible.  18 U.S.C. § 3593(a)(2).  Shortly after its enactment, the Attorney General issued guidelines setting forth internal policies and procedures for the prosecution of all federal cases in which one is charged with a death-eligible offense.  These guidelines are internally created and enforced; the protocol is memorialized in the United States Attorney's Manual ("USAM"),

---

[8] For purposes of this analysis, the Court will assume, without deciding, that the defendant has broadly requested internal DOJ memoranda articulating reasons for disagreement with the U.S. Attorney's recommendation to seek the death penalty.

Section 9-10.000, et seq.[9]

The purpose of the capital case review process the protocol creates "is to allow proper individualized consideration of the appropriate factors relevant to each case." USAM § 9-10.030. The review of cases ultimately "culminates in a decision to seek, or not to seek, the death penalty against an individual defendant." Id. That ultimate decision about whether to seek the death penalty is made by the Attorney General, and the final decision is then conveyed to the United States Attorney in a letter authorizing the U.S. Attorney to seek or not to seek the death penalty. Id. at § 9-10.040.

To inform the charging decision, the United States Attorney must submit to the Assistant Attorney General for the Criminal Division, among other materials, a completed death penalty evaluation form describing the facts and evidence underlying the

---

[9] The Department of Justice promulgated the Protocol in 1995, shortly after the enactment of the Federal Death Penalty Act of 1994, codified at 18 U.S.C. § 3591. The most recent and relevant revisions to the Protocol became effective July 1, 2007. The protocol generally applies to federal prosecutions in which the death penalty may be sought:

> This Chapter sets forth the policies and procedures for all Federal cases in which a defendant is charged, or could be charged, with an offense subject to the death penalty. ... The provisions in this Chapter are effective July 1, 2007, and they apply to any case currently under indictment.

USAM § 9-10.010.

indictment, a detailed prosecution memorandum, relevant court decisions, a non-decisional information form, and materials provided by defense counsel. Id. at § 9-10.080. The protocol seeks to maintain the confidentiality of certain internal submissions by immunizing them from discovery: "[t]he prosecution memoranda, death penalty evaluation forms, non-decisional information forms and any other internal memoranda informing the review process and the Attorney General's decision are not subject to discovery by the defendant or the defendant's attorney." Id.

In fact, the protocol demands confidentiality in the review process leading to the Attorney General's determination; USAM § 9-10.040 provides:

> The decision-making process preliminary to the Attorney General's final decision is confidential. Information concerning the deliberative process may only be disclosed within the Department and its investigative agencies as necessary to assist the review and decision-making. This confidentiality requirement does not extend to the disclosure of scheduling matters or the level at which the decision is pending within the Department during the review process. The scope of confidentiality includes, but is not limited to: (1) the recommendations of the United States Attorney's Office, the Attorney General's Review Committee on Capital Cases (hereinafter the "Capital Review Committee"), the Deputy Attorney General, and any other individual or office involved in reviewing the case; (2) a request by the United States Attorney that the Attorney General authorize withdrawal of a previously filed notice of intent to seek the death penalty; (3) a request by a United States Attorney that the Attorney General authorize not seeking the death penalty

>pursuant to the terms of a proposed plea agreement; and (4) the views held by anyone at any level of review within the Department.
>
>In no event may the information identified in this paragraph be disclosed outside the Department and its investigative agencies without prior approval of the Attorney General.

Upon receipt of the U.S. Attorney's submissions, the Assistant Attorney General for the Criminal Division forwards the materials to the Capital Case Unit. <u>Id.</u> at §9-10.120. When the U.S. Attorney seeks the Attorney General's authorization for the death penalty, the Capital Review Committee then meets with defense counsel and representatives of the U.S. Attorney's Office to consider the case and the capital penalty recommendation before it. <u>Id.</u> ("No final decision", the Manual instructs, "to seek the death penalty shall be made if defense counsel has not been afforded an opportunity to present evidence and argument in mitigation"). The Committee then makes its recommendation to the Attorney General, through the Deputy Attorney General, after considering all the information submitted. <u>Id.</u>

As a result of revisions that became effective in July 2007, the protocol now provides that the U.S. Attorney receives a copy of *the Committee's* memorandum if the Committee's recommendation is contrary to that of the U.S. Attorney:

>If the Committee's recommendation differs from that of the United States Attorney, **the United States Attorney shall be provided with a copy of the Committee's recommendation memorandum**

>      when it is transmitted to the Deputy Attorney
>      General.  The United States Attorney may
>      respond to the Committee's analysis in a
>      memorandum directed to the Deputy Attorney
>      General.  The Deputy Attorney General will then
>      make a recommendation to the Attorney General.
>      The Attorney General will make a final decision
>      whether the Government should file a notice of
>      intent to seek the death penalty.

Id. at 9-10.120 (emphasis added).

## II.

The defendant's post-trial discovery request was inspired by this most recently-revised provision of the protocol: Sylvester contends that he is entitled to assess the evidentiary value of this internal memorandum.  Based on the clear language of the protocol, the case law, and the privilege that attaches to this pre-decisional internal departmental memorandum, the Court disagrees.[10]

The defendant's discovery request is premised upon the speculation that the Attorney General ultimately rejected the U.S. Attorney's recommendation to seek the death penalty because it determined that AUSA Landrieu violated DOJ policy by using the death

---

[10]  At the outset, the Court notes that there is some dispute as to whether the defendant's motion, which is styled as a post-trial motion for discovery based on newly-discovered evidence, is indeed based on evidence that is "newly" discovered.  But because the Court determines that the Committee's memorandum is not evidence, and, therefore, does not even reach whether the defendant could satisfy the Freeman new trial standard, it is unnecessary to determine when counsel for defendant in the exercise of diligence should have known about the revisions of the protocol.

penalty as bargaining leverage during plea negotiations.[11]  In other words, Sylvester's argument in support of his asserted right to discover the Committee's memorandum assumes that a violation of DOJ policy equates with a violation of the defendant's fair trial rights, and further assumes that an internal departmental memorandum is evidence and not privileged material.  He is wrong.

A.  Judicial Enforcement of the Protocol

There is generally no basis for judicial enforcement of internal DOJ guidelines.  It is well-settled that DOJ policy, as manifested in the U.S. Attorney's Manual, does not create any substantive or procedural rights, including discovery rights.  The Manual is explicit:

> [t]he Manual provides only internal Department of Justice guidance.  It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any manner civil or criminal.

Id. at § 1-1.100; see also id. at § 9-10.080 ("[t]he prosecution memoranda, death penalty evaluation forms, non-decisional information forms and any other internal memoranda informing the review process and the Attorney General's decision are not subject to discovery by the defendant or the defendant's attorney"). Sylvester wants to see the Committee's recommendation memorandum,

---

[11] Section 9-10.110 of the USAM provides in part that "[t]he death penalty may not be sought, and no attorney for the Government may threaten to seek it, solely for the purpose of obtaining a more desirable negotiating position."

an excerpt of which was provided to the U.S. Attorney's Office, presumably in accordance with the protocol's mandate that the Committee provide the U.S. Attorney a copy of its recommendation memorandum when it disagrees with the U.S. Attorney's recommendation.  The protocol resists, by its terms, Sylvester's claim of right to see the internal memorandum because it constitutes "internal memoranda informing the review process and the Attorney General's decision."  Courts agree.

Courts have uniformly and quite firmly determined that these internal guidelines do not create any rights in criminal defendants.  See, e.g., United States v. Fernandez, 231 F.3d 1240, 1246 (9th Cir. 2000) ("the USAM guidelines cannot serve as a legal basis for [a] discovery order").  Indeed, as one recent district court's survey of the law has noted "[n]umerous circuit courts have...held that DOJ guidelines, policies, and manuals do not create any enforceable procedural or substantive rights for criminal defendants."  See United States v. Lujan, 530 F. Supp. 2d 1224 (D. New Mexico 2008)[12] (citing, among others, United States v. Wilson, 413 F.3d 382, 389 (3d Cir. 2005) (listing cases from First, Second, Sixth, Ninth, and D.C. Circuits)); see also Nichols v. Reno, 931 F. Supp. 748, 751

---

[12] In United States v. Lujan, 530 F. Supp. 2d 1224 (D. New Mexico 2008), the court denied a defendant's motion for disclosure of information concerning the decision to seek the death penalty. The defendant had requested disclosure of the U.S. Attorney's initial recommendation and supporting documentation for the death penalty in his case.

(D.Colo.) (Death penalty protocol did not provide defendant with judicially enforceable substantive or procedural rights), aff'd 124 F.3d 1376 (10th Cir. 1997); United States v. O'Reilly, No. 05-80025, 2008 WL 284003, at *12 (E.D.Mich. Feb. 1, 2008); United States v. McVeigh, 944 F. Supp. 1478, 1483 (D.Colo. 1996) (holding that "the decision to seek the death penalty under the Act is a matter of prosecutorial discretion [and] [t]he Protocol [does] not create any individual right or entitlement subject to ... due process protections"). The Court agrees that the DOJ internal policy such as the death penalty protocol does not create any substantive or procedural rights for defendants and is at its core the function of a prosecutor's charging decision. See, e.g., United States v. Haynes, 242 F. Supp. 2d 540, 541 & n. 1 (W.D. Tenn. 2003) (denying motion to discover prosecution memorandum as a matter of prosecutorial discretion unreviewable by the court and citing cases that have rejected similar motions); United States v. Furrow, 100 F. Supp. 2d 1170, 1178 (C.D. Cal. 2000) (holding that defendant cannot rely on internal DOJ manual to compel production of internal prosecution documents because, among other reasons, DOJ guidelines do not create any substantive rights).[13] Sylvester has no right

---

[13] Accordingly, courts as a matter of law and public policy lack authority to order review of the U.S. Attorney's submission to the Attorney General. United States v. Shakir, 113 F. Supp. 2d 1182, 1186-87 (M.D. Tenn. 2000) (denying the defendant's request for pre-authorization discovery, finding that "the Protocol does not create any enforceable substantive or procedural rights in the defendants, and that the DOJ's

under the protocol to discover the Committee's memorandum.

B.  The Deliberative Process Privilege

Courts have also consistently upheld the Government's invocation of the deliberative process and work product privileges and have respected Federal Rule of Criminal Procedure 16(a)(2) when faced with discovery requests for internal prosecution memoranda. See United States v. Fernandez, 231 F.3d 1240, 1246-47 (9th Cir. 2000) ("Rule 16...recognizes the work product privilege and excepts from production 'reports, memoranda, or other internal governmental documents made by the attorney for the government or any other government agent investigating or prosecuting the case"); United States v. Hargrove, 2005 WL 2122310, at *6 (D.Kan. Aug. 25, 2005) (unpublished opinion) (denying request for discovery of

---

interpretation of its internal policy, prohibiting the disclosure of pre-authorization discovery, is a matter of prosecutorial discretion which is presumptively unreviewable by this Court"). The court expressed its reluctance to "interfere in a matter of agency discretion", noting:

> Moreover, Congress, in passing 18 U.S.C. § 3593, did not dictate any restrictions or procedures regarding the process by which the government reaches its decision of whether to seek the death penalty, nor did Congress make any provisions for judicial review of such decision or for the defendant's participation in the certification process.  18 U.S.C. 3593.

Id.

The Court finds that these principles apply with equal force to the defendant's request for the Committee's internal submission to the Deputy Attorney General and Attorney General.

15

prosecution's capital charging practices); United States v. Edelin, 128 F. Supp. 2d 23, 39-41 (D. D.C. 2001) (denying similar request based on deliberative process, attorney-client, and work product privileges); Furrow, 100 F. Supp. 2d at 1174-75 (determining that death penalty evaluation form and prosecution memorandum fall within deliberative process, attorney-client, and work product privileges); United States v. Frank, 8 F. Supp. 2d 253, 284 (S.D.N.Y. 1998) (denying motion to disclose materials prepared in making decision to seek death penalty based on deliberative process privilege and noting that "[d]iscovery of the deliberative materials would have a chilling effect on the thorough evaluation of these issues and hinder the just, frank, and fair review of the decision for every individual defendant who faces the prospect of receiving a Notice of Intent to Seek the Death Penalty).

The Court agrees with these courts and upholds the Government's invocation of the deliberative process privilege. The Committee memorandum excerpt sought by the defendant here is an internal, pre-decisional, inconclusive governmental document created as part of the deliberative process and is plainly sheltered by the deliberative process privilege.[14]

---

[14] The deliberative process privilege "covers 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) (quoting N.L.R.B. v. Sears, Roebuck & Co., 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)). The obvious and

Accordingly, the USAM guidelines, and the recent amendments and related Congressional hearings, cannot serve as a basis for the defendant's discovery request. The material requested is not discoverable under the terms of the USAM, and is also privileged material. Because the defendant provides no support for any independent constitutional basis for his intrusion of the protocol, his motion must be denied.[15]

---

important purpose of the deliberative process privilege is to encourage frank discussion of legal or policy matters in writing, thereby improving agency decision-making processes. See Sears, Roebuck & Co., 421 U.S. at 150-51, 95 S.Ct. 1504. Here, the Committee's memorandum falls squarely within the deliberative process privilege. It is clearly pre-decisional because the review process proceeds as such: the U.S. Attorney submits documents to the Committee, which then submits its recommendation to the Attorney General, who ultimately makes the decision about whether to pursue the death penalty. The Committee memorandum is deliberative in that it seeks to assist the Attorney General in his determination of whether the death penalty is appropriate under the circumstances and therefore "contains opinions, recommendations, or advice about agency policies." See Fernandez, 231 F.3d at 1246 (concluding that both the deliberative process and work product privileges applied to the death penalty evaluation form and prosecution memorandum). An atmosphere that will generate open and even contentious policy discussions and reviews ought not be threatened by the sort of requests now before this Court and considered by other courts.

[15] The defendant vaguely suggests entitlement to the Committee's memorandum based on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). But Brady only applies to evidence, not attorney recommendations. See Edelin, 128 F. Supp. 2d at 41 ("The requested information cannot be categorized as material, in terms of Brady, because the information is inadmissible, and thus cannot affect the outcome of a trial or sentencing"). Moreover, although Brady entitles a defendant to production of exculpatory evidence, it does not reach the prosecution's analysis of such evidence. Cf. Furrow, 100 F.Supp. 2d at 1178 (The defendant's argument "fails to note the distinction between exculpatory material and work product related to the

Finally, in addition to the substantive rulings the Court has made, the Court has also reviewed *in camera* the excerpt of the Committee's memorandum to the Deputy Attorney General and Attorney General, that was provided to the U.S. Attorney in June 2005. The Court's review fails to provide support for the accusation that Landrieu perjured himself when he testified that the Attorney General did not reveal his reasons to him.[16] Moreover, the

---

material. <u>Brady</u> may entitle the defendant to production of mental health records he refers to, however, <u>Brady</u> does not reach the prosecution's analysis of them").

Here, the Court already ruled on August 23, 2007, that the Government's pre-trial *in camera* submissions, including internal Department of Justice memoranda, did not constitute <u>Brady</u> or <u>Giglio</u> material. This ruling applies with full force to the Government's current *in camera* submission of the Committee's memorandum.

[16] During cross-examination of Landrieu at trial, defense counsel alluded to this DOJ policy against using the death penalty as a bargaining chip and this exchange followed:

> Q: The policy behind it is because the threat of the death sentence, it is such a terrible hammer, that we don't want attorneys using it to secure negotiating positions; correct?
> A: I would assume that's probably correct.
> Q: Which is just what you did?
> A: No, sir.
> Q: Well, can you explain to this jury, when we have a dead federal witness, why the Attorney General would otherwise have rejected the death penalty in this case?
> A: You would have to ask the Attorney General that question.
> Q: Well, I don't have a line to the Attorney General and there is none right now, so I can't. He resigned.
> ...
> Getting serious back again, the first

memorandum seems inscrutable about what defense counsel believes would support his theory of perjury.[17]

---

       time they turned you down.  Did they tell you why?
A:   No, sir.
Q:   They did it against the backdrop of that provision, did they not?
A:   I'm not sure what they based it on.  They do not have to explain their answers to me.
Q:   Did you ever think about it, why a dead federal witness wouldn't call for the death penalty?
A:   It's not my job to second-guess them.
Q:   Is it not your job to think?
A:   It is my job to think, but me thinking is not going to do anything to change their minds.  They make the decisions in Washington.  I obey their orders.

The defendant's theory is that the existence of the Committee's memorandum articulating reasons for its disagreement with the U.S. Attorney's recommendation makes, according to defense counsel during oral argument, "the critical government witness on the most critical issue in the case [Sylvester's confession] a demonstrable liar."

[17] Moreover, the defendant has not and could not glean from this internal deliberative pre-decisional memorandum that the governmental misconduct he asserts is in any way relevant to the issue of the Sylvester's guilt or the admissibility of the evidence relating to his confession.  Cf. U.S. v. West, 672 F.2d 796 (10th Cir. 1982) (discovery of Office of Professional Responsibility files would simply amount to a fishing expedition where *in camera* review of files failed to uncover any reference to perjury by prosecutor as to whether certain matter contained exculpatory material; the files may be relevant to the allegation of governmental misconduct but, absent evidence that the alleged misconduct was so grievous as to deny the defendant a fair trial, it should not "be allowed to obscure the issue of [the defendant's] guilt"); cf. United States v. Connolly, 504 F.3d 206, 218 (1st Cir. 2007) (newly discovered evidence of congressional report criticizing FBI's handling of organized crime matters was not relevant to defendant's guilt).

Accordingly, the defendant's motion based on newly-discovered evidence is DENIED.

New Orleans, Louisiana, May 27, 2008.

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE